Esfand Y. Nafisi (SBN 320119)
enafisi@classlawdc.com
Nicholas A. Migliaccio (*pro hac vice* anticipated)
nmigliaccio@classlawdc.com
Jason S. Rathod (*pro hac vice* anticipated)
jrathod@classlawdc.com
Erick J. Quezada (*pro hac vice* anticipated)
equezada@classlawdc.com
**MIGLIACCIO & RATHOD LLP**
388 Market Street, Suite 1300
San Francisco, California 94111
Office: (415) 489-7004

Christopher R. Pantel (SBN 256569)
christopher.pantel@ayslaw.com
**ALBRIGHT, YEE & SCHMIT, APC**
888 West 6th Street, 14th Floor
Los Angeles, California 90017
Tel: (213) 833-1700/Fax: (213) 833-1710

*Attorneys for Plaintiff and the Proposed Class*

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AMBER DOBSON, on behalf of herself and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> ZENIMAX MEDIA INC., BETHESDA SOFTWORKS LLC, BETHESDA GAME STUDIOS, and DOES 1 through 100, inclusive, <br><br> Defendants. | Case No. _____ <br><br> CLASS ACTION COMPLAINT <br><br> (1)  Violation of California's Consumers Legal Remedies Act, Cal. Civ. Code §1750, *et seq.*; <br> (2)  Violation of California's False Advertising Law, Cal. Bus. & Prof. Code §17500, *et seq.*; <br> (3)  Violation of the Unfair Prong of the UCL, Cal. Bus. & Prof. Code §17200, *et seq.*; <br> (4)  Violation of the Song-Beverly Act. Cal. Civ. Code §1790, *et seq.* <br><br> DEMAND FOR JURY TRIAL |

Defendants, aware their self-described video "game-as-a-service" known as Fallout 76 was unfinished and unready for launch in November 2018, nevertheless engaged in a misleading marketing campaign and implemented an unfair policy to maximize profits through the denial of refunds. Defendants' greed-driven scheme is at the expense of California consumers, and in violation of applicable law.

1.     Plaintiff Amber Dobson, by and her undersigned attorneys, brings this action on behalf of herself and on behalf of a Class of all others similarly-situated against ZeniMax Media Inc., Bethesda Softworks LLC and Bethesda Game Studios (collectively, "Defendants") for rescission, monetary damages, and injunctive and declaratory relief. Plaintiff alleges the following on personal knowledge of the matters set forth herein. As to the remaining allegations, Plaintiff alleges the following on information and belief and developed from the investigation and analysis of counsel.

## NATURE OF THE ACTION

2.     Plaintiff brings this action on behalf of herself and other similarly-situated consumers in California who purchased the Windows PC version of the *Fallout 76* video game-as-a-service ("*Fallout 76*" or the "PC Version") via Defendants' online store, Bethesda.net, on or after June 5, 2018.

3.     *Fallout 76* is an always-online, multiplayer, survival and exploration video game-as-a-service. "Games-as-a-service" refers to the provision of always-online video game content on a continuing revenue model, which can derive profits ***both*** from the initial sale of the software required to access the game-as-a-service online, as well as post-launch monetization of the service itself. Recurring monetization drives the game-as-a-service business model. Utilization of the games-as-a-service format marked a notable departure for Defendants from previous entries in the *Fallout* video game series going back to 2008. The prior *Fallout* games, as well as many of Defendants' other titles, did not employ the games-as-a-service business model.

4.     *Fallout 76*, unlike numerous other titles in the game-as-a-service genre, is ***not*** a free-to-play experience for players. Defendants charged consumers the full retail

Albright
Yee &
Schmit
APC

**CLASS ACTION COMPLAINT**

purchase price for new releases from major studios (different versions of the game cost $59.99 and up at launch).  **Then, in addition,** Defendants derive post-launch monetization through the sale of the fictional, in-game currency, "Atoms."

5.      Post-launch monetization occurs as follows: Players can acquire "Atoms" in-game at various intervals and in limited amounts, or purchase as many "Atoms" as desired anytime with real-world money.  For example, a gamer can acquire a virtual "Jumpsuit" for his or her *Fallout 76* avatar for 600 "Atoms" in Defendants' in-game "Atomic Shop."  Should he or she wish to purchase this item with U.S. Dollars, a purchase of 1,000 "Atoms" for $9.99 is required, since the next lowest price point of $4.99 nets only 500 "Atoms," an insufficient amount to acquire the "Jumpsuit."  Defendants' April 23, 2019 patch, "Wild Appalachia" Patch 8.5, added items to the "Atomic Shop" that offer in-game, competitive advantages, a pay-to-win mechanic.

6.      Consequently, if customers were allowed to return *Fallout 76*, Defendants would lose **not only** the initial purchase price, but **also** potential income, possibly for years if Defendants operate the servers that long, from ongoing in-game purchases from the "Atomic Shop."

7.      On information and belief, Defendants marketed and sold a game-as-a-service only one other time prior to *Fallout 76*, when they released *The Elder Scrolls Online* on or about April 4, 2014.  Unlike *Fallout 76*, however, *The Elder Scrolls Online* was not sold exclusively through Bethesda.net, meaning *The Elder Scrolls Online* was subject to the return policy of at least one third-party vendor.

8.      After a limited early access period, Defendants launched *Fallout 76* on November 14, 2018, on multiple gaming platforms, as well as Windows PC.  Defendants made the PC Version available **only** via the Bethesda.net online store, a decision which was intended to, and indeed had the effect of, preventing all PC customers from purchasing the *Fallout 76* game-as-a-service through any third-party.

9.      Plaintiff, and other similarly situated consumers in California, soon discovered that *Fallout 76* was an unfinished product beset by, for example, freezes, lag,

missing features, limited content and game breaking bugs that made the gameplay experience untenable. Plaintiff promptly requested a refund from Bethesda.net. Plaintiff's refund requests were denied. Defendants' policy is that refunds are not allowed for digitally downloaded titles, which include the PC Version.

10.     Prior to the release of *Fallout 76*, Defendants were aware of the numerous performance issues plaguing their unfinished game-as-a-service that would induce many consumers to demand a refund. The provision of refunds, however, would deprive Defendants of ***not only*** the lucrative retail sales of Fallout 76, ***but also*** the recurring and highly desirable monetization tail afforded by the game-as-a-service business model (as explained in ¶¶4-5, *supra*). Consequently, rather than issue refunds pursuant to the policies of industry-standard, third-party vendors such as Steam or Epic, which Defendants did not control, Defendants conspired to limit the sale of the PC Version to their own platform, Bethesda.net, through which they could refuse to issue refunds to consumers.

11.     Prior to Fallout 76's November 2018 release date, Pete Hines, Bethesda Softworks' Vice President of PR and Marketing ("Mr. Hines"), stated that Defendants' decision to limit the sale to Bethesda.net was purportedly to have a "direct relationship" with customers, specifically:

> "Well because of the kind of game it is," Hines said when asked [why] Fallout 76 is bypassing Steam. "Because it's an online, always-on game-as-a-service. Based on our experience based on other things that we've done, we felt like having a direct relationship with our customers was super important to us. And so doing it through Bethesda.net, exclusively, allows us to have that one-to-one relationship with customers, that quite honestly you don't always have when you go through another third-party where they might own the relationship with the customer in terms of being able to email them or to reach out directly and contact them."

(https://www.gamespot.com/articles/why-fallout-76-isnt-releasing-on-steam/1100-6462400/).

12.     On information and belief, however, Mr. Hines' statement was public relations spin to hide Defendants' actual rationale for limiting customer download options. Defendants pre-launch decision to limit the sale of the PC Version to their own

Albright
Yee &
Schmit
APC

**CLASS ACTION COMPLAINT**

proprietary Bethesda.net (the "one-to-one relationship with customers" described by Mr. Hines) was in actuality a premeditated, cynical move to prevent consumers from obtaining refunds for the unfinished and defective *Fallout 76* game-as-a-service. Defendants' policy decision was intended to, and in fact had, the effect that consumers were unfairly prevented from benefitting from industry-standard practices for the issuance of refunds for digital downloads.

13.    The Bethesda.net policy to deny all refund requests is in stark contrast to popular third-party software vendors.  These vendors allow refunds for digitally downloaded titles.  *See, e.g.*, https://store.steampowered.com/steam_refunds ("You can request a refund for nearly any purchase on Steam—for any reason. Maybe your PC doesn't meet the hardware requirements; maybe you bought a game by mistake; maybe you played the title for an hour and just didn't like it."); *see also* https://www.epicgames.com/site/en-US/store-refund-policy ("Don't like what you bought? Read on for how to return your purchase for a refund.  If you've recently made a purchase through the Epic Games store and want a refund, you're in the right place. Below you'll find all the info on what you can refund, when you can refund, and how to begin the process.").

14.    Through its misleading pre-launch marketing and unreasonable restriction on product returns of the PC Version, Defendants violated California law prohibiting misleading and unfair sales practices. Specifically, Defendants violated California's Unfair Competition and False Advertising Laws, Business & Professions Code §§ 17200 and §§ 17500, *et seq.*, and the California Consumers' Legal Remedies Act, California Civil Code §§ 1750, *et seq.*  Further, pursuant to the Song-Beverly Act, Cal. Civ. Code §1790, *et seq.*, Defendants' disclaimer of express warranties is void due to their material misrepresentations which were relied on by Plaintiff and the Class.

15.    Plaintiff, on her own and on behalf of all others similarly situated in California, now seeks declaratory relief, rescission or damages, restitution, and other equitable remedies, including an injunction enjoining Defendants' methods, acts, and

practices as described herein, as well as Plaintiff's reasonable attorneys' fees and expert fees, and any additional relief that this Court determines to be necessary or appropriate to provide complete relief to Plaintiff and the Class.

## **PARTIES**

16.    Plaintiff AMBER DOBSON ("Dobson") is an individual who resides in South Lake Tahoe, California. In reliance on Defendants' advertising and marketing, Dobson paid full retail price for a digital copy of the PC version, which she downloaded from Bethesda.net on or about November 14, 2018.  Dobson's experience with Fallout 76 was marred by game breaking bugs, all of which were solely and exclusively caused by Defendants, specifically, *inter alia*, server crashes, slow performance, freezing and lost save files.  Dobson contacted Bethesda customer support and demanded a refund on November 16, 2018, promptly and only two days after launch. Defendants denied her refund request on November 29, 2018: "Customers who have downloaded the game are not eligible for a refund."  Plaintiff subsequently abandoned any gameplay.

17.    Defendant ZENIMAX MEDIA INC. ("ZeniMax"), is a corporation organized under the laws of the State of Delaware, with headquarters in Rockville, Maryland.  On information and belief, ZeniMax was registered to conduct business in the State of California on or about August 9, 1999.  ZeniMax is the parent of Bethesda Softworks LLC.

18.    Defendant BETHESDA SOFTWORKS LLC ("Bethesda Softworks"), is a limited liability company organized under the laws of the State of Delaware, with headquarters in Rockville, Maryland.  On information and belief, Bethesda Softworks was registered to conduct business in the State of California on or about May 27, 2014.

19.    Plaintiff is informed and believes, and thereon alleges, that BETHESDA GAME STUDIOS ("Bethesda Game Studios") is a division of Bethesda Softworks functioning as the same legal entity.

20.    The true names and capacities of Defendants sued herein as Does 1 through 100, inclusive, are presently unknown to Plaintiff who therefore sues these Defendants

Albright
Yee &
Schmit
APC

**CLASS ACTION COMPLAINT**

by fictitious names. Plaintiff will amend this Complaint to show their true names and capacities when they have been ascertained. Each of the Doe Defendants is responsible in some manner for the conduct alleged herein.

21.    Plaintiff is informed and believes, and thereon alleges, that each and every one of the acts and omissions alleged herein were performed by, and/or are attributable to, all Defendants, each acting as agents and/or employees, and/or under the direction and control of each of the other Defendants, and that said acts and failure to act were within the course and scope of such agency, employment and/or direction and control.

## JURISDICTION AND VENUE

22.    Pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. §1332(d)(2) and (6), this Court has original jurisdiction. The aggregated claims of the individual class members exceed the sum or value of $5,000,000, exclusive of interest and costs. This is a class action in which at least one member of the plaintiff class is a citizen of a state other than the states in which Defendants are incorporated and have their principal place of business.

23.    This Court has personal jurisdiction over this action because Defendants conduct business operations in the State of California, including within the boundaries of this judicial district; consented to jurisdiction by registering to conduct business in California as alleged hereinabove; maintain sufficient minimum contacts in California; and otherwise intentionally avail themselves of the markets within California through the promotion, sale, marketing, and distribution of products, which renders the exercise of jurisdiction by this Court proper and consistent with traditional notions of fair play and substantial justice.

24.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(a) and (b), because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this judicial district. Venue is also proper under 18 U.S.C. §1965(a) because Defendants transact substantial business in this District.

Albright
Yee &
Schmit
APC

**CLASS ACTION COMPLAINT**

## FACTUAL ALLEGATIONS

**A.  Defendants' Misleading and Deceptive Marketing of *Fallout 76* Reached a Large Audience Including E3 2018 and PAX Australia.**

25.    Defendants' pre-release marketing for *Fallout 76* reached a large audience. On or about May 29, 2018, a graphic depicting the words 'Please Stand By' was posted to Defendants' official Twitter feed.  Previously, the graphic was part of the title sequence for each game in Defendants' *Fallout* series. The post quickly generated 146,000 likes and 60,000 retweets, and 'Bethesda' remained in the top ten trending topics on Twitter for several hours.   Defendants' official Twitch account began livestreaming shortly afterwards.  The livestream revealed little, if anything, about *Fallout 76*.  Yet even still, as the livestream concluded Todd Howard, Director and Executive Producer at Bethesda Game Studios ("Mr. Howard"), appeared onscreen to reveal that over two million unique viewers tuned in for at least part of the stream, with over 100,000 viewers watching simultaneously for the majority of the broadcast.

26.    Defendants made *Fallout 76* available for pre-order a week later on or about June 5, 2018, even though the public knew virtually nothing about the title.

27.    On June 10, 2018, at the Los Angeles Electronic Entertainment Expo (E3), Mr. Howard unveiled the *Fallout 76* game-as-a-service to a live audience as well as through a live stream accessible on Defendants' website, twitch.tv, and youtube.com. Mr. Howard stated: "We have built a platform of 100 percent dedicated servers that will support the game now and for years to come" and he made other representations including, but not necessarily limited to:

> A.    Fallout 76 has all new rendering lighting and landscape technology, contains sixteen times the detail [than Defendants' prior games] and players can view distant weather systems across the game map;
>
> B.    Fallout 76 is "four times the size" of Defendants' prior title, Fallout 4, which was a successful single-player game released in 2015;
>
> C.    Fallout 76 is an open-world survival game with a death system that will not result in losing substantial progress;
>
> D.    Fallout 76 is an online-only survival game that players can experience solo or in multiplayer with dozens of other players;
>
> E.    Players will never see a server;

Albright
Yee &
Schmit
APC

F.   Players can join their friends while maintaining their own progress in their game; and

G.   Players can build camps that follow the player.

28.   Mr. Howard also announced a B.E.T.A. test (Break-it-Early-Test-Application) and acknowledged Defendants' reputation for releasing games with bugs. Purportedly, the B.E.T.A. would allow Defendants to remedy such issues *prior to the release date*.   On information and belief, however, as late as four months before the B.E.T.A., Defendants' development team was still working on the principal gameplay mechanics of *Fallout 76*.

29.   Mr. Hines also made misleading public statements prior to the launch of *Fallout 76*, including but not necessarily limited to PAX Australia on or about October 11-13, 2018.   These statements were widely reported and available to California consumers at all times relevant hereto.   According to Mr. Hines: "Folks that want to spend money on whatever the hell it is because they don't have enough Atoms, they can, but it's not, 'I'm now better playing against other players because I spent money.' *It's not pay-to-win*. And it's not loot crates." (Emphasis supplied.)   On information and belief, Mr. Hines' statement was intentionally misleading.   In actuality, Defendants planned to add "pay-to-win" mechanics to *Fallout 76* from its earliest development stages but decided to wait until several months after release so as not to jeopardize pre-orders and sales from the resulting bad press.   Indeed, on or about April 23, 2019, Defendants duly released "Fallout 76 Update 8.5" which added the "pay-to-win" mechanic described as "Basic Repair Kits."   These kits are available only via the "Atomic Shop" and confer significant in-game advantages by drastically reducing the amount of resources (and, of course, the in-game time required to collect those resources) for players to maintain their avatar in peak efficiency – a fundamental goal of the game-as-a-service which confers gameplay and "player v. player" advantages.   Defendants pre-release statement that "pay-to-win" mechanics would be excluded was intended to, and in fact did, mislead consumers and induce them to make a non-refundable pre-order or purchase of *Fallout 76* on release.

30.     In or about October 2018, days before the B.E.T.A. **and months after the PC Version of Fallout 76 was first available for non-refundable pre-order in June 2018**, Defendants issued a release stating: "Usually after years of development, we finally finish, release the game, and take a break. **With Fallout 76, we feel we have not finished, but reached a starting line** where all new work begins." (Emphasis added).

31.     On October 30, 2018, the Windows PC B.E.T.A. test started.  B.E.T.A. access periods were limited to specific dates and time windows, and in order to access the B.E.T.A., players were required to pre-order the game (*i.e.*, they paid full retail price prior to release and sight unseen – a non-refundable purchase on Bethesda.net). Individuals participating in the PC B.E.T.A. reported numerous problems with installation, pop-in, lighting, blurry visuals, *etc*. After logging back in following a server crash, other players reported missing progress and content.

B.     **Shortly After the B.E.T.A., *Fallout 76* Released with Crippling Problems and Missing Features.**

32.     Only three weeks after Fallout 76's B.E.T.A. test, on November 14, 2018, the *Fallout 76* game-as-a-service released on the Windows PC platform.  Defendants issued a day-one patch of 54 GBs, approximately 9 GBs larger than the actual game.  At launch, the game-as-a-service had no push to talk functionality, despite Defendants' promise to add such functionality after the B.E.T.A.  This meant that gamers' microphones were always on and could not be turned off.

33.     By November 20, 2018, reviewers complained about the poor quality of Defendants' aging game engine, framerate slowdowns, motion sickness and an overall experience marred by numerous and consistent game breaking bugs and crashes.  Players experienced frequent disconnections and server issues when attempting to set up groups with other players.

34.     In contrast to Mr. Howard's claims at E3 2018 that new rendering, lighting and landscape technologies would allow visuals with "sixteen times" the detail as Defendants' past games, players complained the graphics looked visually worse than

Albright Yee & Schmit APC

previous entries in the *Fallout* series.  Although camps were meant to be portable, with the option to move across servers, players routinely found their items disappeared when setting up camp in a different location.  With limited permanence, those players that were able to play the game at all found hours of progress wiped every time they either logged out of the game or suffered a server disconnection.  In short, as Defendants well knew at all relevant times hereto, *Fallout 76* did not work as advertised.

35.    *Fallout 76* was, and remains, a commercial and critical flop that sold considerably fewer units than its 2015 predecessor, *Fallout 4*.  On November 22, 2018, nearly a week after the disappointing release, Defendants decreased *Fallout 76's* price by about 1/3, to $40.00.  This decrease was not retroactive, meaning anyone who purchased the game-as-a-service between June 5, 2018, and November 21, 2018, overpaid for an unfinished and deceptively marketed product by a significant margin.  Multiple news outlets identified the discount as being the result of poor performance and low quality.

36.    On December 4, 2018, Defendants released a new patch, but failed to disclose the game-altering changes implemented thereby.  Defendants promised greater quality in the future.

C.    **Defendants Schemed to Prevent Consumers from Returning a Defective, Unfinished Product.**

37.    Prior to the release of *Fallout 76*, Defendants were aware their unfinished game-as-a-service had numerous issues that would induce many consumers to demand a refund.  Defendants nevertheless engaged in a widespread marketing and advertising campaign to induce players to purchase the game-as-a-service, including but not limited to Mr. Howard's misleading public statements at E3 2018.

38.    Through consistently critical reviews of its B.E.T.A. testing periods, Defendants were made further aware of the myriad of technical and design problems affecting the quality of and basic functionality of *Fallout 76*.  Due to the short time between the B.E.T.A. testing period (starting October 23, 2018) and the release date (November 14, 2018), Plaintiff alleges, on information and belief, that Defendants never

intended the B.E.T.A. to have a material impact on the final release.  The B.E.T.A, rather was also a cynical scheme to lock each loyal, unsuspecting fan of the *Fallout* series into a non-refundable pre-order purchase of the PC version.

39.    Defendants conspired to void the refund rights of consumers. The provision of refunds would deprive Defendants of **not only** the lucrative retail sales of Fallout 76, **but also** the recurring and highly desirable monetization tail afforded by the game-as-a-service business model.   Consequently, rather than process refunds pursuant to the policies of industry-standard, third-party vendors such as Steam or Epic, Defendants opted to limit the sale of the PC Version to their own platform, Bethesda.net, through which they could unfairly refuse to issue refunds to consumers.

40.    Shortly after launch, numerous media outlets reported that Defendants would not issue refunds for *Fallout 76*.   On information and belief, on account of Defendants' policy, numerous California consumers who were misled by Defendant's marketing, did not seek refunds for Fallout 76 even though they were unhappy with the game-as-a-service and wanted a refund.

D.    **Plaintiff's Experience**.

41.    Prior to making her purchase, Plaintiff Dobson watched numerous advertisements for *Fallout 76* on television and Twitch, and she read articles about the title on several websites, including but not limited to Game Informer and IGN.   The representations by Defendants in these advertisements and within these third-party sources portrayed *Fallout 76* as a premium game-as-service that would be playable on release, without game-breaking bugs. Plaintiff also performed Google searches for *Fallout 76* and read web content about the title which, on information and belief, quoted misleading statements made by Defendants about the playability and features of the game.  Plaintiff also watched Todd Howard's 2018 E3 presentation wherein she viewed the numerous misrepresentations made (see ¶27, *supra*) about the scope and quality of the title.

Albright
Yee &
Schmit
APC

42.     In reliance on Defendants' misleading marketing, Plaintiff Dobson purchased a digital copy of the PC Version, which she downloaded from Bethesda.net on or about November 14, 2018.  At all times relevant hereto, Dobson: used a PC that met the required specifications to facilitate the running of the *Fallout 76* game-as-a-service; had an appropriate network connection; correctly accessed the game-as-a-service; understood and was able to operate the game-as-a-service mechanics; and properly deployed available updates to the game-as-a-service which were available prior to the date she demanded a refund.  Despite the foregoing, Dobson's experience with *Fallout 76* was marred by game breaking bugs, all of which were solely and exclusively caused by Defendants, specifically, *inter alia*, server crashes, slow performance, freezing and lost save files.  Dobson contacted Defendants' customer support and demanded a refund on November 16, 2018, promptly and only two days after launch. Defendants denied her refund request on November 29, 2018, due to their uniform policy affecting all purchasers of the PC Version: "Customers who have downloaded the game are not eligible for a refund."

## CLASS ALLEGATIONS

43.     Plaintiff incorporates and reallege each and every preceding paragraph as if fully set for herein.

44.     Plaintiff brings this action on behalf of herself and the members of the proposed Class and Subclass. The proposed Class consists of:

> All individuals residing in the State of California who, on or after June 5, 2018, paid monies to Defendants to purchase the Windows PC version of the Fallout 76 video game-as-a-service via Defendants' online store, Bethesda.net.

45.     The proposed Subclass consists of:

> All individuals residing in the State of California who, on or after June 5, 2018, paid monies to Defendants to purchase the Windows PC version of the Fallout 76 video game-as-a-service via Defendants' online store, Bethesda.net; who, in writing to Defendants, requested a refund; and who were denied a refund.

46.     Excluded from the Class and Subclass is each Defendant, its parents, subsidiaries, affiliates, officers and directors, any entity in which Defendant has a

controlling interest, all customers who make a timely election to be excluded, governmental entities, and all judges and their staff assigned to hear any aspect of this litigation, as well as their immediate family members.

47.    Plaintiff reserves the right to alter that Class definitions as she deems necessary at any time to the full extent of the Federal Rules of Civil Procedure, the Local Rules of the U.S. District Court for the Eastern District of California, and applicable precedent allow.

**Federal Rule of Civil Procedure (FRCP) Rule 23**

48.    Certification of the proposed class and subclass is appropriate because individual Class members can prove the elements of their claims on a class-wide basis using the same evidence they would use to prove those elements through individual litigation.

49.    **Numerosity: Rule 23(a)(1):** The members of the class and subclass are so numerous that joinder is impractical. The class and subclass consist of thousands of members, the precise number of which is within the knowledge of and can be ascertained only by review of Defendants' records.

50.    **Commonality and Predominance: Rules 23(a)(2) and 23(b)(3):** Numerous questions of law and fact common to the class and subclass predominate over any questions affecting only individual members of the class and subclass. All class and subclass members were exposed to Defendants' deceptive marketing practices concerning *Fallout 76*. At the time that class and subclass members purchased *Fallout 76*, Defendants held exclusive knowledge of *Fallout 76's* technical problems and the condition in which the game would be launched. By refusing to issue refunds, each subclass member suffered the same substantial injury.

51.    Among the questions of law and fact common to the class and subclass are:

    A.    Whether Defendant engaged in unfair, unlawful and/or fraudulent business practices under California law;

    B.    Whether Defendant mispresented and/or failed to disclose material facts.

    C.    Whether Defendant made false or misleading statements of fact;

Albright
Yee &
Schmit
APC

D.   Whether Defendant breached express warranties;

E.   Whether Defendant violated the Song-Beverly Act, Cal. Civ. Code §1790, *et seq.*;

F.   Whether Defendants' return policy foreclosed the possibility of refunds for digital downloads of *Fallout 76*;

G.   Whether Defendant's conduct, as alleged herein, was intentional and knowing;

H.   Whether class members are entitled to damages and/or restitution, and in what amount;

I.   Whether class members are entitled to rescission;

J.   Whether an injunction is necessary; and

K.   Whether Plaintiff and class members are entitled to an award of reasonable attorneys' fees, pre-judgment interest, and cost of suit.

52.   **Typicality: Rule 23(a)(3):** Plaintiff's claims are typical of the claims of the members of the class and subclass. All class and subclass members were subject to Defendants' uniform misleading and marketing practices and Defendants' uniform policy to deny refunds for digital downloads. Plaintiff has no antagonistic interest to any other member of the class and subclass.

53.   **Adequacy: Rule 23(a)(4):** Plaintiff is an adequate representative who will fully and adequately assert and protect the interests of the class and subclass. Plaintiff's counsel have substantial experience and success in the prosecution of complex class action and consumer protection litigation.

54.   **Superiority: Rule 23(b)(3):** Adjudication of this lawsuit as a class is superior to any other available means because individual litigation of the claims of all members of the class is economically unfeasible and procedurally impracticable. While the aggregate damages sustained by the class and subclass are in the millions of dollars, the individual damages incurred by each member of the class resulting from Defendants' wrongful conduct are too small to warrant the expense of individual lawsuits. The likelihood of individual class members prosecuting their own separate claims is remote, and, even if every member of the class and subclass could afford individual adjudication, the court system would be unduly burdened by such cases.

55.   Prosecuting separate actions by class members would create the risk of establishing inconsistent standards of conduct for Defendants. Individual actions may be

dispositive of the interests of the class, even if certain class members are not parties to such actions.

56.      **Declaratory and Injunctive Relief: Rule 23(b)(2):** Defendants acted or refused to act on grounds generally applicable to Plaintiff and the members of the class, thereby final injunctive relief and declaratory relief is appropriate with respect to the class and subclass.

57.      **Issue Certification: Rule 23(c)(4)**: Plaintiff also satisfy the requirements for maintaining a class action under Rule 23(c)(4).  Her claims consist of particular issues that are common to all Class and Subclass members and are capable of class-wide resolution that will significantly advance the litigation.

### FIRST CLAIM FOR RELIEF
**Violation of California's Consumers Legal Remedies Act**
**Cal. Civ. Code §1750 *et seq.* on Behalf of Plaintiff, the Class, and the Subclass**
**Against All Defendants**

58.      Plaintiff repeats and re-alleges each and every allegation contained above as if set forth herein.

59.      The California Legal Remedies Act ("CLRA"), Cal. Civ. Code §1750, *et seq.*, prohibits "unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer[.]" Cal. Civ. Code §1770(a).

60.      The CLRA defines "person" as "an individual, partnership, corporation, limited liability company, association, or other group, however organized." Cal. Civ. Code §1761(c).  Defendants, Plaintiff, the class and the subclass are "persons" within the meaning of the CLRA.

61.      Under the CLRA, a "consumer" is "an individual who seeks or acquires, by purchase or lease, any goods or services for personal, family, or household purposes." Cal. Civ. Code §1761(d).  Plaintiff, the class, and the subclass are "consumers" within the meaning of the CLRA.

Albright
Yee &
Schmit
APC

**CLASS ACTION COMPLAINT**

62.     Defendants' *Fallout 76* game-as-a-service constitutes "goods" or "services" as defined by Cal. Civ. Code §1761(a) and (b).

63.     A "transaction," as defined by the CLRA, is "an agreement between a consumer and another person, whether or not the agreement is a contract enforceable by action, and includes the making of, and the performance pursuant to, that agreement." Cal. Civ. Code §1761(e).  The purchase of the *Fallout 76* game-as-a-service by Plaintiff, the class, and the subclass is a transaction with Defendants within the meaning of the CLRA.

64.     Plaintiff contends that Defendants, in the course of their business, violated the CLRA as detailed above.  Specifically, Defendants marketed and sold the *Fallout 76* game-as-a-service in a manner that concealed from Plaintiff and the Class the myriad of technical and design problems affecting the quality of and basic functionality of *Fallout 76* and then refused to issue refunds to purchasers of the PC Version.  Plaintiff alleges Defendants engaged in one or more of the following unfair or deceptive acts or practices as defined in Cal. Civ. Code §1770(a):

A.     Defendants' acts and practices constitute misrepresentations that *Fallout 76* had characteristics, uses, or benefits that it does not have;

B.     Defendants misrepresented that *Fallout 76* had a particular standard, quality, and grade when it did not;

C.     Defendants' acts and practices constitute the advertisement of goods and/or services without the intent to sell them as advertised; and/or

D.     Defendants made material omissions;

E.     Defendants inserted an unconscionable provision in a contract by implementing an unlawful policy and/or practice of refusing to refund purchasers who paid for a finished and playable video-game-as-a-service, but received an unfinished and unplayable video-game-as-a-service.

65.     Plaintiff and the Class suffered ascertainable loss and actual damage as a direct and proximate result of Defendants' concealment, misrepresentations, omissions of material information, refusal to offer a refund for *Fallout 76*, and refusal to honor refund requests for *Fallout 76*.

66.     On information and belief, Defendants will continue to commit the foregoing acts and omissions, unless the Court orders Defendants to cease and desist.

Albright
Yee &
Schmit
APC

**CLASS ACTION COMPLAINT**

66.     By reason of the foregoing, Plaintiff and the Class have been irreparably harmed.

67.     Pursuant to Cal. Civ. Code §1780, Plaintiff and the Class seek an order enjoining Defendants' methods, acts, or practices; actual damages; restitution; punitive damages; rescission; court costs and attorney's fees; and any other relief that this Court deems proper.

68.     On or about December 4, 2018, Defendants were provided notice pursuant to Cal. Civ. Code § 1782, subdivision (a)(1) of violations of the CLRA "including but not limited to Cal. Civ. Code §1770(a), subsections 5, 7, 9, and 14, in connection with the marketing and/or sale of the Fallout 76 game by refusing to issue refunds for purchasers of the game who found it to be unplayable because of its technical problems." **Exhibit B**.   On or about January 31, 2019, Defendants, through counsel, declined to resolve the dispute.

### SECOND CLAIM FOR RELIEF
**Violation of California's False Advertising Law**
**Cal. Bus. & Prof. Code §17500, *et seq.*, on Behalf of Plaintiff,**
**the Class, and the Subclass Against All Defendants**

69.     Plaintiff repeats and re-allege each and every allegation contained above as if set forth herein.

70.     Plaintiff brings this action on behalf of themselves and the Class against all defendants for violations of California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code §17500 *et seq*.

71.     Defendants' acts and practices as described herein have deceived and/or are likely to deceive Plaintiff and Class members.  Defendants engaged in public advertising and marketing that made material misrepresentations and omissions regarding the condition of the *Fallout 76* game-as-service upon its release.  Defendants also made material misrepresentations about future additions to the title, specifically that the game-as-a-service would not be pay-to-win.  Such advertisements deceived and continue to deceive the consuming public for the reasons detailed above.

Albright
Yee &
Schmit
APC

72.    In marketing *Fallout 76* and omitting disclosure of its knowledge detailed above, Defendants knew or should have known that its representation and omissions were misleading.

73.    Defendants intended Plaintiff and Class members to rely upon the advertisements and numerous material misrepresentations as set forth more fully elsewhere in the Complaint.   In fact, Plaintiff and Class members relied upon the advertisements and misrepresentations to their detriment.

74.    As a result of Defendants' misrepresentations and omissions, Plaintiff and the Class suffered real financial damages.

75.    Pursuant to the FAL, Plaintiff and the Class seek an order or judgment as necessary to restore any monies acquired by unfair competition, including restitution and/or disgorgement, rescission and/or any other relief that this Court deems proper.

### THIRD CLAIM FOR RELIEF
**Violations of the UCL**
**Cal. Bus. & Prof. Code §17200, *et seq.* on Behalf of Plaintiff,**
**the Class, and the Subclass  Against All Defendants**

76.    Plaintiff repeats and re-allege each and every allegation contained above as if set forth herein.

77.    Plaintiff brings this action on behalf of herself, the class, and the subclass against all defendants for violations of the unfair and unlawful prongs of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §17200 *et seq*.

78.    The UCL defines unfair business competition to include any "unlawful, unfair or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising. Cal. Bus. & Prof. Code §17200.

79.    Defendants violated the "unfair" prong of the UCL through the acts and omissions detailed herein. Defendants' acts and omissions are immoral, unethical, oppressive, and/or unscrupulous and caused and will cause injuries to consumers and, therefore, constitute unfair conduct within the meaning of the UCL.

Albright
Yee &
Schmit
APC

79.     The acts and practices alleged herein are also unfair because they caused Plaintiff, and reasonable consumers like her, to incur financial loss. The gravity of the harm to Plaintiff, the class, and subclass class resulting from these unfair acts and practices outweighs any conceivable reasons, justifications and/or motives of Defendants for engaging in such deceptive acts and practices. By committing the acts and practices alleged above, Defendants engaged in unfair business practices within the meaning of the UCL.

80.     Defendant violated the unfair prong of the UCL by making material misrepresentations and omissions regarding the condition of the *Fallout 76* game-as-a-service upon its release.  Defendants also made material misrepresentations about future additions to the title, specifically that the game-as-a-service would not be pay-to-win.

81.     In marketing Fallout 76 and omitting disclosure of its knowledge detailed above, Defendants knew or should have known that their representations and omissions were misleading.

82.     Bethesda's no-refund policy precluding refunds to its consumers who were sold Fallout 76 is unconscionable within the meaning of Cal. Civ. Code § 1670.5.

83.     Bethesda's policy and/or practice of refusing to award refunds to its customers constitutes an unlawful business act or practice within the meaning of the UCL because, among other things, it is unconscionable within the meaning of Cal. Civ. Code § 1670.5, and it constitutes a breach of contract and a breach of the implied covenant of good faith and fair dealing.

82.     As a result of Defendants' misrepresentations, omissions, and refusal to provide refunds, Plaintiff, the Class, and the Subclass suffered real financial damages.

83.     Pursuant to the UCL, Plaintiff, the Class, and Subclass seek an order or judgment as necessary to restore any monies acquired by unfair competition, including restitution and/or disgorgement, rescission, an injunction enjoining Bethesda from implementing its no refund policy for Fallout 76, and any other relief that this Court deems proper.

Albright
Yee &
Schmit
APC

**CLASS ACTION COMPLAINT**

## FOURTH CLAIM FOR RELIEF
### Violation of the Song-Beverly Act
### Cal. Civ. Code §1790, *et seq.* on Behalf of Plaintiff,
### the Class, and the Subclass Against All Defendants

84.     Plaintiff repeats and re-alleges each and every allegation contained above as if set forth herein.

85.     Plaintiff brings this action on behalf of themselves and the Class against all Defendants for violations of the Song-Beverly Act, Cal. Civ. Code §§ 1790, *et seq*.

86.     Plaintiff and the Class who purchased *Fallout 76* are "buyers" within the meaning of Cal. Civ. Code §§ 1791(b).

87.     The *Fallout 76* video game-as-a-service is a "consumer good" within the meaning of Cal. Civ. Code § 1791(a).

88.     Defendants are a "manufacturer" of *Fallout 76* within the meaning of Cal. Civ. Code § 1791(j).

89.     Defendants made express warranties to Plaintiff and Class and Subclass members within the meaning of Cal. Civ. Code §§ 1791.2 and 1793.2, as described above.

90.     Defendants provided these warranties to Plaintiff and the Class and Subclass. These warranties formed the basis of the bargain that was reached when Plaintiff and the Class purchased *Fallout 76*.

91.     Plaintiff and the Class and Subclass reasonably relied on Defendants' express warranties concerning *Fallout 76*. Unbeknownst to Plaintiff and the Class and Subclass, however, Defendants had made material misrepresentations and omissions regarding the technical specifications, features, and playability of the *Fallout 76* game-as-a-service.  Further unbeknownst to Plaintiff and the Class and Subclass, Defendants also made misrepresentations about future additions to the title, specifically that the game-as-a-service would not be pay-to-win.

Albright
Yee &
Schmit
APC

**CLASS ACTION COMPLAINT**

92.     As a direct and proximate result of Defendants' breach of express warranties, Plaintiff and the Class and Subclass suffered financial loss, and seek damages in an amount to be determined at trial.

93.     Pursuant to Cal. Civ. Code §§ 1793.2 and 1794, Plaintiff and the Class and Subclass members seek an order enjoining Defendants' unfair and/or deceptive acts or practices, damages, punitive damages, and any other just and proper relief available under the Song-Beverly Consumer Warranty Act.

## **PRAYER FOR RELIEF**

Wherefore, Plaintiff, on behalf of herself and the Class and Subclass members, respectfully requests that the Court:

A.     Certify this case as a class action pursuant to Federal Rule of Civil Procedure Rule 23, as set forth above;

B.     Appoint Defendants as financially responsible for notifying Class members of this suit;

C.     Award Plaintiff and Class members appropriate monetary relief, such as actual damages and/or restitution;

D.     Award Plaintiff and Class members equitable, injunctive and declaratory relief as appropriate under the applicable law;

E.     Award Plaintiff and Class members pre-judgment and post-judgment interest as prescribed by law;

F.     Award punitive damages as permitted by law;

G.     Award reasonable attorney's fees and costs as permitted by law; and

H.     Enter such other and further relief as may be just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a jury trial on all issues so triable.

Albright
Yee &
Schmit
APC

DATED:  June 14, 2019          ***

Respectfully submitted,


By:  /s/ Esfand Y. Nafisi

Esfand Y. Nafisi (SBN 320119)
enafisi@classlawdc.com
**MIGLIACCIO & RATHOD LLP**
388 Market Street, Suite 1300
San Francisco, California 94111
Office: (415) 489-7004

Nicholas A. Migliaccio (*pro hac vice* anticipated)
nmigliaccio@classlawdc.com
Jason S. Rathod (*pro hac vice* anticipated)
jrathod@classlawdc.com
Erick J. Quezada (*pro hac vice* anticipated)
equezada@classlawdc.com
**MIGLIACCIO & RATHOD LLP**
412 H Street NE, 3rd Floor
Washington, DC 20002
Tel: (202) 470-3520/Fax: (202) 800-2730

Christopher R. Pantel (SBN 256569)
christopher.pantel@ayslaw.com
**ALBRIGHT, YEE & SCHMIT, APC**
888 West 6th Street, 14th Floor
Los Angeles, California 90017
Tel: (213) 833-1700/Fax: (213) 833-1710


*Attorneys for Plaintiff and the Proposed Class*

Albright
Yee &
Schmit
APC

**CLASS ACTION COMPLAINT**